1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SPECIALTY SURPLUS INSURANCE
COMPANY, Individually and as Assignee of
the City of Tacoma,

Plaintiff,

v.

LEXINGTON INSURANCE COMPANY
and GULF UNDERWRITERS
INSURANCE, INC.,

Defendants.

CASE NO. C06-5246RJB

ORDER (1) GRANTING IN
PART AND DENYING IN PART
DEFENDANT LEXINGTON
INSURANCE COMPANY'S
MOTION FOR SUMMARY
JUDGMENT, (2) DENYING
SPECIALTY'S CROSS MOTION
FOR PARTIAL SUMMARY
JUDGMENT AGAINST
LEXINGTON, (3) GRANTING
AND DENYING SPECIALTY'S
MOTIONS TO FILE EXHIBITS
UNDER SEAL, AND (4)
DENYING SPECIALTY'S
CROSS MOTION FOR PARTIAL
SUMMARY JUDGMENT
AGAINST GULF

This matter comes before the Court on Defendant Lexington Insurance Company's

Motion for Summary Judgment (Dkt. 22), joined by Gulf Underwriters Insurance, Inc. (Dkt. 24);

Specialty's Cross Motion for Partial Summary Judgment Against Lexington (Dkt. 35); Plaintiff

Specialty's Motions to File Exhibits Under Seal (Dkt. 37, Dkt. 57); and Specialty's Motion for

Partial Summary Judgment Against Gulf (Dkt. 53). The Court has considered the pleadings filed

in support of and in opposition to the motions and the remainder of the file herein.

**I. FACTUAL BACKGROUND**

1   This action arises out of a lawsuit brought against the City of Tacoma ("the City") and

2   involving the April 26, 2003, shooting death of Crystal Brame by her husband, David Brame, who

3   was the Chief of Police for the City of Tacoma. Dkt. 31 at 1. The Brames' children, Ms. Brame's

4   estate, and Ms. Brame's parents ("the underlying plaintiffs") filed suit against the City, seeking

5   damages resulting from injuries Ms. Brame incurred, including her death. Dkt. 23-2, Exh. 1 at 2.

6   In the complaint, claims against the City of Tacoma were as stated as follows:

> As a result of defendant's conduct as alleged herein, Plaintiffs claim damages and have asserted causes of action under the common law and statutory actions for wrongful death (RCW 4.20.010 and .20), survival actions (RCW 4.20.046 and .60), statutory action for injury or death of child (RCW 4.24.010), common law loss of consortium, negligent infliction of emotional distress, intentional infliction of emotional distress, deprivation of constitutionally protected right to life and liberty (including consortium and association, tort of outrage, improper referral/recommendation, negligence, recklessness and/or intentional acts.

Dkt. 23-2, Exh. 1 at 22. Under the heading "Time & Place of Injury," the June 2003 Claim for

Damages states, "Crystal Brame was shot on April 26, 2003, in Gig Harbor, Washington by

David Brame, her husband, and died in Seattle at Harborview Medical Center on May 3, 2003."

Dkt. 34-3, Exh. 2 at 2. The June 2003 Claim for Damages lists the parties' injuries, in part, as

follows:

> The injuries and damages consist of the injury to and killing of Crystal Brame, as well as all consequences from those facts, both before, at the time, and after the shooting and death of Crystal Brame, including her injuries and conscious pain and suffering.

Id. The August 2003 Claim for Damages and Offer of Settlement summarizes the claims similarly:

> The injuries and damages consist of the harassment, domestic violence against, and, ultimately, the fatal shooting of Crystal Brame, as well as all consequences from those facts. The time of injury is before, at the time of, and after the death of Crystal Brame. These injuries include personal injuries suffered before her death, including conscious pain and suffering after she was shot in the head.

Dkt. 34-4, Exh. 3 at 2.

The City tendered the claim to four insurers, three of which are involved in this litigation:

Specialty Surplus Insurance Company ("Specialty"), Gulf Underwriters Insurance Company

("Gulf"), and Lexington Insurance Company ("Lexington"). Dkt. 23 at 1. Specialty and the fourth

insurance company defended the City in the litigation. The City ultimately settled that litigation

for $12 million, $6 million of which was funded by Specialty and $1 million of which was funded

by the City. Dkt. 33 at 1. Pursuant to the Settlement Agreement, the City of Tacoma assigned any and all rights it had against Lexington and Gulf to Specialty. Dkt. 34-2, Exh. 1 (Settlement Agreement) at 1.

**A. LEXINGTON**

The City of Tacoma had four Lexington insurance policies with four separate policy periods:

Policy Number 8669038: August 12, 1994 to August 12, 1995 (Dkt. 23-3, Exh. 2)

Policy Number 866-9098: August 12, 1995 to August 12, 1996 (Dkt. 23-4, Exh. 3)

Policy Number 878-6557: August 12, 1996 to August 12, 1997 (Dkt. 23-5, Exh. 4)

Policy Number 8898421: August 12, 1997 to August 12, 1998 (Dkt. 23-6, Exh. 5)

Each policy provided three lines of coverage: "Coverage A" refers to coverage for "personal injury," "Coverage B" refers to coverage for "property damage," and "Coverage C" refers to "errors and omissions" coverage:

> *The Company will pay on behalf of the Insured the Ultimate Net Loss in excess of the Insured's Retained Limit hereinafter stated which the Insured shall become legally obligated to pay as Damages because of:*
>
> *A. Personal Injury;*
> *B. Property Damage; or*
> *C. Public Officials Errors and Omissions*
>
> *To which this policy applies caused by an Occurrence or a Wrongful Act.*

Dkt. 22 at 6; Dkt. 23-3, Exh. 2 at 2; Dkt. 23-4, Exh. 3 at 2; Dkt. 23-5, Exh. 4 at 2; Dkt. 23-6, Exh. 5 at 2. Specialty does not seek Coverage under Coverage B. *See* Dkt. 31 at 6-22.

An "occurrence" is "an accident or event, including continuous or repeated exposure to conditions, which result in Personal Injury, Property Damage, or Public Officials Errors and Omissions neither expected nor intended from the standpoint of the Insured." *See, e.g.*, Dkt. 23-3, Exh. 2 at 7.

The Lexington policies also include the following clause:

> *POLICY PERIOD - TERRITORY*
>
> *This policy applies to Personal Injury, Property Damage, or Public Officials Errors and Omissions occurring anywhere in the world during the Policy Period.*

Dkt. 22 at 7;  Dkt. 23-3, Exh. 2 at 3; Dkt. 23-4, Exh. 3 at 3; Dkt. 23-5, Exh. 4 at 3; Dkt. 23-6, Exh. 5 at 3.

Lexington denied coverage. Dkt. 34-10, Exh. 9 at 1. The denial of coverage was based on the following conclusions: the plaintiffs did not allege physical injury to Ms. Brame by Chief Brame or any "occurrences or wrongful acts" by other defendants during the policy period of the Lexington policies; the allegedly unlawful activities were not committed while acting for or on behalf of the insured; and the $1 million Insured's Retained limit would not likely be reached. *Id.* at 4-5.

**B. GULF**

The City of Tacoma had two Gulf insurance policies. Policy Number GU6084759 was effective from August 12, 1998, to August 12, 1999. Dkt. 25, Exh. A. Policy Number GU6084778 was effective from August 12, 1999, to August 12, 2000. Dkt. 25, Exh. B. The Gulf policies provide the same three lines of coverage as the Lexington policies and provide as *follows:*

> *We will pay on your behalf the Ultimate Net Loss in excess of your Retained Limit*
> *hereinafter stated which you will become legally obligated to pay as damages because of:*
>
> *A. Personal injury;*
> *B. Property Damage; or*
> *C. Public Officials' Errors and Omissions*
>
> *To which this policy applies caused by an Occurrence or a Wrongful Act.*

Dkt. 24 at 3; Dkt. 25, Exh. A at 5; Dkt. 25, Exh. B at 38. The Gulf policies also include the following clause:

> *POLICY PERIOD - TERRITORY*
>
> *This policy applies to Personal Injury, Property Damage, or Public Officials Errors and*
> *Omissions occurring anywhere in the world during the Policy Period.*

Dkt. 24 at 3; Dkt. 25, Exh. A at 6; Dkt. 25, Exh. B at 39.

Gulf denied coverage, concluding that the occurrences or wrongful acts at issue occurred only after the Gulf policies expired. Dkt. 34-11, Exh. 10 at 1.

## II. PROCEDURAL BACKGROUND

Five motions are currently pending before the Court. On May 24, 2007, Lexington moved

for summary judgment (Dkt. 22). Gulf joined that motion, offering additional argument (Dkt. 24) and evidence (Dkt. 25). On June 25, 2007, Specialty filed a Cross Motion for Partial Summary Judgment Against Lexington (Dkt. 35). On the same day, Specialty also attempted to file its Cross Motion for Partial Summary Judgment Against Gulf but erroneously filed a different document (Dkt. 36). The Court re-noted Lexington and Gulf's motion for consideration on the same day as Specialty's Cross Motion for Partial Summary Judgment Against Lexington. Dkt. 49. Specialty did not actually file the Cross Motion for Partial Summary Judgment Against Gulf (Dkt. 53) until July 20, 2007, the noting day of Lexington and Gulf's motion and Specialty's cross motion. Specialty noted the cross motion against Gulf for consideration on the same day it was filed.

In accordance with Local Rule CR 7(d)(3) and in the interest of judicial economy, the Court re-noted all pending motions for consideration on August 17, 2007. Dkt. 60. Counsel for all parties then filed a letter asking the Court to consider the motions as soon as practicable, notwithstanding the noting date set by the Court, because the parties did not intend to file additional responses or replies. Dkt. 61.

Two unopposed Motions to File Exhibits Under Seal (Dkt. 37, Dkt. 57) are also pending. The parties have responded and replied to all opposed motions, and these matters are now ripe for decision. The Court deems matters raised in the motions suitable for decision without oral argument.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

1   rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

2   *Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative

3   evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a

4   genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed

5   factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v.*

6   *Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

7   *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

8          The determination of the existence of a material fact is often a close question. The court

9   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

10   e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec.*

11   *Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of

12   the nonmoving party only when the facts specifically attested by that party contradict facts

13   specifically attested by the moving party. The nonmoving party may not merely state that it will

14   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

15   to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.

16   Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

17   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

18                                    **IV. DISCUSSION**

19          Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in

20   diversity jurisdiction apply state substantive law and federal procedural law." *Gasperini v. Center*

21   *for Humanities, Inc.*, 518 U.S. 415, 427 (1996). The determination of insurance coverage is a two

22   step process. *Diamaco, Inc. v. Aetna Cas. & Sur.*, 97 Wn. App. 335, 337 (1999). The party

23   seeking to establish coverage bears the initial burden to prove that coverage under the policy has

24   been triggered. *Id.* If coverage is triggered, the insurer then bears the burden to prove that the loss

25   is specifically excluded by the policy language. *Id.* If coverage is not triggered, the court does not

26   proceed to address any exclusions from coverage. *Western National Assur. v. Hecker*, 43 Wn.

27   App. 816, 823 n.2 (1986).

28

Interpretation of insurance policies is a question of law, and courts construe insurance policies as a whole, giving force and effect to each clause in the policy. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874 (1993), *opinion supplemented by* 123 Wn.2d 131 (1994). If the policy language is clear and unambiguous, the court will not modify the policy or create an ambiguity. *Id.* at 874. If the policy language is fairly susceptible to two different reasonable interpretations, it is ambiguous, and the court may attempt to discern the parties' intent by examining extrinsic evidence. *Id.* If the policy remains ambiguous after resort to extrinsic evidence, the court construes the ambiguities against the insurer. *Id.* at 874-75.

## A. CONTINUANCE

As a threshold matter, Specialty contends that Lexington and Gulf's motion should be denied to allow the parties more time to conduct discovery. Dkt. 31 at 23-24; Dkt. 32 at 14-16. The deadline for conducting discovery in this matter is October 9, 2007. Dkt. 17. Federal Rule 56 allows the Court to deny or continue a motion for summary judgment if the defending party establishes that it is unable to properly defend against the motion:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). The party seeking such a continuance must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists. *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129-1130 (9th Cir. 2004). The Court may deny the request unless the party opposing summary judgment articulates how additional discovery may preclude summary judgment and demonstrates diligence in pursuing discovery thus far. *Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994). Specialty seeks additional time to conduct discovery on the following grounds:

> At this time, Plaintiff is unable to present by affidavit all of the facts available for opposition of the two Motions for Summary Judgment, because the information developed during the extensive investigations in this matter are [sic] in the possession of other

1  parties, such as the Attorney General of the State of Washington, the Washington State
2  Police, and within City of Tacoma records. Extensive discovery would be necessary in
   order to obtain the direct evidence underlying the investigations, and the witnesses
3  interviewed or providing reports have not been deposed in this matter. Discovery has not
   concluded in this case, and no depositions have been taken.

4  Dkt. 34 at 3-4. Lexington asks the Court to deny Specialty's request because Specialty fails to

5  identify any specific discovery it needs and because Specialty has not been diligent in conducting

6  discovery thus far. According to Lexington, the only discovery conducted by Specialty as of June

7  29, 2007, was the exchange of initial disclosures. Dkt. 45 at 3.

8         As the defendants note, much of the evidence offered by Specialty is not in the form

9  contemplated by Federal Rule of Civil Procedure 56(e). However, because the factual record in

10 this case is unclear, the Court concludes that summary judgment would be premature in many

11 respects.

12 **B. BREACH OF CONTRACTUAL DUTY TO GIVE NOTICE**

13        Gulf contends that the City's liability is not covered under the Gulf policies because the

14 City breached those policies. Dkt. 51 at 2. Clauses requiring that the insured cooperate or provide

15 timely notice of claims are generally enforceable. *See Northwest Prosthetic & Orthotic Clinic, Inc.*

16 *v. Centennial Ins. Co.*, 100 Wn. App. 546, 550 (2000); *Pilgrim v. State Farm Fire & Cas. Ins.*

17 *Co.*, 89 Wn. App. 712, 719, 723-24 (1997). Such clauses deter fraud and facilitate proper

18 adjustment of claims. *Pilgrim*, 89 Wn. App. at 719. The standard for analyzing the insured's

19 conduct is substantial compliance. *Id.* at 720. If the insurance policy requires the insured to

20 provide notice of claims, "the insured must affirmatively inform the insurer that its participation is

21 desired" and may not rely on the insurance company's notice of the claim. *See Unigard Ins. Co. v.*

22 *Leven*, 97 Wn. App. 417, 427 (1999).

23        Noncooperation is an affirmative defense to be asserted by the insurer but will not result in

24 denial of coverage unless the insurer demonstrates actual prejudice. *See Northwest Prosthetic &*

25 *Orthotic Clinic, Inc. v. Centennial Ins. Co.*, 100 Wn. App. 546, 550 (2000); *Pilgrim v. State*

26 *Farm Fire & Cas. Ins. Co.*, 89 Wn. App. 712, 719-20, 723-24 (1997). To establish actual

27 prejudice, the insurer must demonstrate a "concrete detriment" that "harms the insurer's

28

ORDER
Page 8

1  preparation or presentation of defenses." *Northwest Prosthetic & Orthotic Clinic, Inc.*, 100 Wn.

2  App. at 550. The insurer must demonstrate that "it lost the opportunity to conduct a meaningful

3  evaluation of its own." *Northwest Prosthetic & Orthotic Clinic, Inc.*, 100 Wn. App. at 552.

4  Actual prejudice is ordinarily a question of fact and "will be presumed only in extreme cases."

5  *Pilgrim*, 89 Wn. App. at 725.

6      Gulf contends that the City breached its contractual duty to give Gulf notice of the

7  underlying lawsuits and to cooperate with Gulf's investigation of the claim, breaching Gulf's

8  policies as a matter of law. Dkt. 51 at 2. As a threshold matter, the Court notes that the question

9  of whether this argument entitles *Gulf* to summary judgment is not properly before the Court.

10  Gulf presented this argument in its response to Specialty's cross motion for summary judgment.

11  Dkt. 51. Gulf contends that this argument constitutes "an independent basis for summary

12  judgment in Gulf's favor," but the argument was not presented in Gulf's joinder to Lexington's

13  motion for summary judgment. *See* Dkt. 24 (joinder). The Court therefore does not reach the

14  question of whether lack of notice entitles Gulf to summary judgment.

15      Each of the Gulf policies requires notice of an occurrence, wrongful act, claim, or suit:

16      *(3) Your Duties In the Event of Occurrences, Wrongful Act, Claim or Suit:*

17      *(A) In the event of an Occurrence or Wrongful Act that is reasonably likely to
        involve us, written notice containing particulars sufficient to identify you and also*

18      *reasonably obtainable information with respect to the time, place, and
        circumstances thereof, and the names and addresses of any injured persons and*

19      *witnesses, shall be given by or for you to us or any of our authorized agents as
        soon as practicable [after your Risk Manager, or supervisory-level employee of*

20      *the Named Insured has knowledge of the Occurrence].*

21      *(B) If a claim is made or suit is brought against you that is reasonably likely to
        involve us, you shall immediately forward to us every demand, notice, summons,*

22      *or other process received by you or your representatives.*

23      *(C) You shall cooperate with us and upon our request assist in making
        settlements, in the conduct of suits and in enforcing any right of contribution or*

24      *indemnity . . . and you shall attend hearings and trials and assist in securing and
        giving evidence and obtaining the attendance of witnesses. . . .*

25
        *(5) Action Against Us.*
26      *No action shall lie against us with respect to any Occurrence or Wrongful Act
        unless, as a condition precedent thereto, you shall have fully complied with all the*

27      *terms of this policy . . . .*

28
    ORDER
    Page 9

1   Dkt. 25, Exh. A at 13-14; Dkt. 25, Exh. B at 48-49.

2       Gulf received notice of the Brame lawsuit on June 10, 2003. Dkt. 34-11, Exh. 10 at 1. A

3   claim was made only under the 1999-2000 Gulf policy. *Id.*; Dkt. 52 at 1. No claim was made

4   under the 1998-99 Gulf policy. Dkt. 52 at 1. The City did not provide Gulf with any of the

5   complaints in the underlying lawsuits against the City as required by (3)(B), quoted above. Dkt.

6   52 at 1-2; Dkt. 25, Exh. A at 13; Dkt. 25, Exh. B at 48. In July of 2005, Specialty wrote a letter

7   to Gulf to offer Gulf an opportunity to participate in the proposed settlement between the

8   underlying plaintiffs and the City. Dkt. 56, Exh. 1 at 4.

9       A reasonable jury could conclude that Gulf suffered actual prejudice as a result of not

10  receiving copies of the complaints filed by the underlying plaintiffs. Specifically, the jury could

11  determine that the complaints could have provided clearer notice that the underlying plaintiffs

12  were alleging personal injuries and errors and omissions occurring during Gulf's policy periods.

13  *See, e.g.*, Dkt. 23-2, Exh. 1 at 10-11. On the one hand, the June 2003 Claim for Damages did not

14  specifically reference dates during the Gulf policies. *See* Dkt. 34-3, Exh. 2. On the other hand, the

15  Claim for Damages did reference injuries to Crystal Brame before the shooting. *See id.* at 2.

16  Whether Gulf suffered actual prejudice as a result of not receiving the underlying plaintiffs'

17  complaints is a question fact for trial.

18  **C. COVERAGE A**

19      In seeking summary judgment, Lexington and Gulf devote only one paragraph of briefing

20  to Coverage A, asserting merely that "[t]he underlying plaintiffs did not seek damages for

21  'Personal Injury' or 'Property Damage' that took place during [the] policy period." Dkt. 22 at 7;

22  Dkt. 24 at 3. As explained more fully below, the Court disagrees.

23      **1. Ms. Brame's Injuries**

24      Specialty contends that the underlying plaintiffs sought damages for ongoing domestic

25  violence and abuse and resulted in physical and mental injuries, including Ms. Brame's death. Dkt.

26  31 at 6.

27      Lexington defines "personal injury," in part, as follows:

28

> *(1) Bodily injury. . . shock, mental anguish, mental injury, or death resulting from any of the foregoing;*
>
> *. . .*
>
> *(7) Assault and battery, not committed by, at the direction of, or with the consent of the Insured. However, this limitation does not apply if committed or directed for the purpose of protecting persons from injury or death, or property from damage . . . .*

*See, e.g.*, Dkt. 23-3, Exh. 2 at 8. Gulf's definition of personal injury is similar. Dkt. 25 Exh. A at 12; Dkt. 25, Exh. B at 47.

The June 2003 Claim for Damages does not limit the underlying plaintiffs' claims to the time or fact of Ms. Brame's death:

> The injuries and damages consist of the **injury to** and killing of Crystal Brame, as well as all consequences from those facts, **both before**, at the time, and after the shooting and death of Crystal Brame, including her injuries and conscious pain and suffering.

Dkt. 34-3, Exh. 2 at 2 (emphasis added). The August 2003 Claim for Damages and Offer of Settlement more explicitly includes incidents other than Ms. Brame's death:

> The injuries and damages consist of the **harassment, domestic violence against**, and, ultimately, the fatal shooting of Crystal Brame, as well as all consequences from those facts. The time of injury is **before,** at the time of, and after the death of Crystal Brame. **These injuries include personal injuries suffered before her death**, including conscious pain and suffering after she was shot in the head.

Dkt. 34-4, Exh. 3 at 2 (emphasis added). Contrary to the defendants' assertions, the claims of the underlying plaintiffs are not limited to Ms. Brame's death and do encompass "personal injury" as defined by the polices at issue.

Having determined that the underlying plaintiffs did seek redress for personal injuries, the Court now turns to the issue of whether the settlement represents damages the City of Tacoma was legally obligated to pay because of personal injury occurring within the policy periods of the Gulf or Lexington policies. The claims for damages are vague as to the nature and time period of the alleged domestic violence. *See, e.g.*, Dkt. 34-3, Exh. 2 at 3 ("This was the final event in a serious of domestic violence plaguing David and Crystal Brame's relationship. The shooting happened after David Brame harassed and physically and emotionally abused Crystal, including choking her, threatening to kill her, and pointing a gun at her."); Dkt. 34-4, Exh. 3 at 4 ("Reports of domestic violence in the Brame household were made known to Gig Harbor and City of

1  Tacoma police departments.").

2     The amended complaint filed in King County Superior Court is also vague as to the time

3  period of many alleged personal injuries. *See* Dkt. 23-2, Exh. 1 at 8-9. The amended complaint

4  does allege that in 1996 and the years following, Chief Brame committed acts of domestic

5  violence against his wife and prevented her from reporting such acts. *Id.* at 10. The amended

6  complaint also alleges that Chief Brame verbally, physically, and emotionally abused Ms. Brame

7  from the time they were married in 1991 until the time they separated in 2003. *Id.*  The

8  declaration of Ms. Brame, apparently made in support of a request for a restraining order, alleges

9  abusive behavior by Chief Brame and is similarly vague as to the dates of such behavior. *See* Dkt.

10  34-15, Exh. 14. The Court notes that Chief Brame apparently disputed these allegations. Dkt. 34-

11  5, Exh. 4 at 4 ("Chief Brame filed his own declaration, denying the allegations made by his wife

12  and accusing her of being the physical aggressor in any altercations they may have had."). The

13  only dates listed are in 2002 and 2003, outside the coverage dates of the policies at issue.

14     Though the allegations in the claims for damages and in the amended complaint are

15  primarily focused on the death of Ms. Brame, there are allegations of other incidents falling within

16  the definition of "personal injury." Whether viewed in the light most favorable to the plaintiff or to

17  the defendant, the underlying plaintiffs in the *Brame* litigation alleged personal injuries that may

18  have occurred within the policy coverage dates of three of the Lexington and Gulf policies. The

19  Court should therefore deny Lexington and Gulf's motion seeking to deny coverage for personal

20  injuries to Crystal Brame, excluding her death, under the Lexington and Gulf policies.

21     **2. Ms. Brame's Death**

22     The defendants maintain, however, that Ms. Brame's death differs from her other injuries

23  and is excluded from coverage because it did not occur during the policy periods. Specialty

24  contends that Ms. Brame's death is covered by the policies because the City's settlement

25  encompasses all of Ms. Brame's injuries, including those occurring outside of the policy period,

26  and because at least part of the "occurrence" took place during the policy period. Dkt. 31 at 13.

27     **a. Divisibility of Settlement**

28

ORDER
Page 12

1   Specialty first contends that the settlement between the underlying plaintiffs and the City

2   of Tacoma represents all of the injuries Ms. Brame sustained, including those falling both inside

3   and outside of the policy periods. Dkt. 31 at 12. Legal authority cited by Specialty does not

4   support this contention. *See Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon*, 35

5   F.3d 1325, 1331 (9th Cir. 1994) ("Depending on how the loss represented by the settlement sum

6   is apportioned among the four policy periods, a matter which we do not resolve here (*see*

7   discussion *infra*), the financial burden could well fall heavily, on the Archdiocese. . . . We do not

8   reach the apportionment issue or the arguments addressed to the issue by either party, however . .

9   . ."). Specialty urges the Court to analogize this case to an unpublished case in which the

10   Washington Court of Appeals upheld a trial court's finding that the loss covered by the settlement

11   was indivisible. *State v. Zurich Specialities London Ltd.*, No. 50211-5-I, 2003 WL 1824966, at

12   *5 (Wash. Ct. App. April 07, 2003). The question of whether the damages in this case are

13   indivisible or subject to rational allocation is a subject not yet before the Court.

14   **b. "Personal Injury" and "Occurrence"**

15   Specialty next contends that Ms. Brame's injuries, including her death, resulted from one

16   occurrence and are therefore covered under Coverage A. Dkt. 31 at 12-13. Specialty contends

17   that the occurrence, not the damages, must occur during the policy period. *Id.* at 13. As support,

18   Specialty cites *Interstate Fire*, in which the court held that the plain meaning of a different

19   insurance clause limited coverage to occurrences happening during the policy period. *See*

20   *Interstate Fire*, 35 F.3d at 1329. The court was interpreting a different clause than the provisions

21   governing this case. In *Interstate Fire*, the clause limiting coverage to the policy period was as

22   follows: Underwriters hereby agree ... to indemnify the Assured for all sums which the Assured

23   shall be obligated to pay by reason of the liability imposed upon the Assured by law ... for

24   damages ... on account of personal injuries ... arising out of *any occurrence happening during the*

25   *period of Insurance*. *Id.* (emphasis added).

26   In this case, the Lexington and Gulf policies limit coverage to personal injuries, not

27   occurrences, that happen during the policy period:

28   *POLICY PERIOD - TERRITORY*

1

*This policy applies to Personal Injury, Property Damage, or Public Officials Errors and*
2  *Omissions occurring anywhere in the world during the Policy Period.*

3  Dkt. 23-3, Exhs. 2-5 at 3 (Lexington); Dkt. 25, Exh. A at 6 (Gulf); Dkt. 25, Exh. B at 39 (Gulf).

4  The Lexington and Gulf policies describe "occurrences" as potentially involving continuous or

5  repeat exposure but do not define "personal injury" in such an expansive manner. *See, e.g.*, Dkt.

6  23-3, Exh. 2 (Lexington) at 3 ("For the purpose of determining the limit of the Company's

7  liability, all Personal Injury or Property Damage or Wrongful Act claims arising out of continuous

8  or repeated exposure to substantially the same general conditions shall be considered as arising

9  out of one Occurrence."), 7 ("'Occurrence' means an accident or event, including continuous or

10 repeated exposure to conditions, which result in Personal Injury . . . neither expected nor intended

11 from the standpoint of the Insured. All such exposure to substantially the same general conditions

12 shall be deemed one 'occurrence.'"), 8 (definition of personal injury); Dkt. 25, Exh. A (Gulf) at

13 12 ("For the purpose of determining the limit of our liability, the Ultimate Net Loss arising from

14 damages for Personal Injury . . . claims arising out of continuous, repeated, or related exposure to

15 substantially the same general conditions shall be considered as arising out of one Occurrence or

16 Wrongful Act . . . ."), 12 (defining "occurrence" as "[a]n accident or event, including continuous

17 or repeated exposure to substantially the same general harmful conditions during the policy

18 period, resulting in Bodily Injury . . . ." and defining personal injury).

19     Lexington Policies 2, 3, and 4 go so far as to require that bodily injury occur during the

20 policy period in order for an accident or event to constitute an "occurrence." Dkt. 23-4, Exh. 3 at

21 8 (defining "occurrence" in part as "[a]n accident or event, including injurious exposure to

22 conditions, which results during the policy period, in Bodily Injury or Property Damage . . . .").

23 The 1999-2000 Gulf policy includes a similar definition. *See* Dkt. 25, Exh. B at 47 (defining

24 "occurrence" as "a happening or event or continuous or repeated exposure which results in Bodily

25 Injury or Property Damage during the Policy Period . . . .").

26     Whether Ms. Brame was continuously or repeatedly exposed to harmful conditions that

27 ultimately led to her death such that the harmful conditions constitute one "occurrence" is a

28 question for the trier of fact. There is no dispute, however, that the Lexington and Gulf policies

1   apply only to personal injuries occurring during the policy period and that Ms. Brame's death was

2   a personal injury occurring outside of the policy periods. The Court should therefore grant

3   Lexington and Gulf's motion seeking to deny coverage for Ms. Brame's Death under Coverage A

4   of the Lexington and Gulf policies.

5       **3. Specialty's Cross Motions**

6       The Court has determined that the underlying plaintiffs in the *Brame* litigation alleged

7   personal injuries occurring within the policy coverage dates of the Lexington and Gulf policies. It

8   does not follow, however, that summary judgment in Specialty's favor is proper.

9       At the risk of oversimplification, Coverage A under the Gulf and Lexington policies offers

10  coverage for the following: (1) damages in excess of the retained limit (2) that the City of Tacoma

11  is legally obligated to pay (3) because of (4) personal injury (5) occurring anywhere in the world

12  during the policy period and (6) caused by an occurrence (unexpected and unintended accident

13  causing personal injury) or wrongful act (actual or alleged error or omission in the discharge of

14  duties).

15      There is no dispute that the City paid damages (of $12 million) in excess of the City's

16  retained limit. *See* Dkt. 33 at 1. Specialty fails to prove, however, that the City's damages

17  represent personal injury caused by an occurrence or wrongful act or that, in light of the three-

18  year statute of limitations for personal injury under RCW 4.16.080(2), the City was legally

19  obligated to pay such damages. The Court should therefore decline to grant summary judgment in

20  favor of Specialty as to Coverage A.

21  **D. COVERAGE B**

22      Lexington and Gulf contend that Specialty is not entitled to coverage under Coverage B,

23  which covers property damage. Dkt. 22 at 6; Dkt. 24 at 3.  Specialty does not appear to seek such

24  coverage, apparently because the underlying plaintiffs did not state claims for property damage.

25  *See* Dkt. 31 at 6-22; Dkt. 23-2, Exh. 1. The Court should therefore grant Defendant Lexington

26  Insurance Company's Motion for Summary Judgment (Dkt. 22), joined by Gulf (Dkt. 24), as to

27  Coverage B.

28  **E. COVERAGE C**

**1. Lexington Policy 1 and Policy 2**

Under Lexington's Policy 1 (Policy Number 8669038), and Policy 2 (Policy Number 866-9098), personal injury is excluded from coverage under Coverage C. Dkt. 23-3, Exh. 2 at 6; Dkt. 23-4, Exh. 3 at 7.  In the response, Specialty concedes that these exclusions bar coverage under Coverage C. Dkt. 31 at 15 n.3 ("Specialty concedes that the exclusion for Personal Injury which is contained in the first and second Lexington policies would take the case out of Coverage C . . . ."); Dkt. 31 at 17 ("Specialty agrees that personal injury was alleged and excluded from Coverage C in the first two policies."). Summary judgment in favor of Lexington as to Coverage C under Lexington Policy 1 and Policy 2 is proper.

**2. Lexington Policy 3 and Policy 4 and Gulf Policies**

Lexington and Gulf both seek summary judgment as to coverage under Policies 3 and 4 on the grounds that (1) no loss or Wrongful Act occurred during the policy period and (2) coverage is excluded for claims arising from willful commission of a crime. Dkt. 22 at 22-23; Dkt. 24 at 4-5.

**a. Losses From Wrongful Acts During Policy Period**

The Lexington and Gulf policies limit coverage to public officials' errors and omissions that happen during the policy period:

*POLICY PERIOD - TERRITORY*

*This policy applies to Personal Injury, Property Damage, or Public Officials Errors and Omissions occurring anywhere in the world during the Policy Period.*

Dkt. 23-3, Exhs. 2-5 at 3 (Lexington); Dkt. 25, Exh. A at 6 (Gulf); Dkt. 25, Exh. B at 39 (Gulf). Coverage C, "Public Officials' Errors and Omissions," is defined similarly by the Lexington and Gulf Policies. Lexington's definition is "losses from Wrongful Acts committed by an Insured." Dkt. 23-5, Exh. 4 at 10; Dkt. 23-6, Exh. 5 at 10. Gulf's definition is "losses from Wrongful Acts committed by you." Dkt. 25, Exh. A at 12; Dkt. 25, Exh. B at 48.

None of the policies defines "loss." Black's Law Dictionary defines "loss" as "[t]he amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable." Black's Law Dictionary (8th ed. 2004). Merriam-

1  Webster defines "loss" in part as "the amount of an insured's financial detriment by death or

2  damage that the insurer is liable for." A wrongful act is defined by the Lexington policies as "any

3  actual or alleged negligent act, error or omission arising out of the conduct of an Insured in the

4  discharge of duties on behalf of the Named Insured during the Policy Period." Dkt. 23-5, Exh. 4

5  at 10; Dkt. 23-6, Exh. 5 at 10. The Gulf policies contain similar definitions. Dkt. 25, Exh. A at 12

6  ("any actual or alleged negligent act, error or omission of an Insured that arises out of the

7  discharge of duties for the Named Insured during the policy period."); Dkt. 25, Exh. B at 48 ("any

8  actual or alleged error or misstatement or misleading statement, act or omission, neglect, or

9  negligence including misfeasance and nonfeasance by an Insured rendered in the discharge of

10  his/her duties for you.").

11         The underlying plaintiffs alleged several losses from wrongful acts that may have occurred

12  during the Gulf and Lexington policy periods: ignoring calls for help knowing that violence could

13  result; ignoring or concealing facts that justified preventative action; failing to investigate and

14  appropriately act upon allegations of rape, sexual harassment, and domestic violence by David

15  Brame; failing to place David Brame on administrative leave and relieve him of his badge and gun;

16  negligent hiring, retention, supervision, promotion and/or entrustment of the position, color of

17  office, firearm and power of Chief of Police to David Brame; failing to investigate David Brame's

18  allegations of domestic violence by Crystal Brame in 1996 and 1998, etc. *See* Dkt. 23-2, Exh. 1.

19  The Court cannot rule as a matter of law that these allegations lack factual support or did not

20  occur during the relevant policy periods. Therefore, summary judgment in favor of the defendants

21  as to Coverage C is not appropriate.

22                **b. Exclusion for Criminal Acts**

23         The defendants also contend that the damages sought by the underlying plaintiffs are

24  excluded from coverage because they arose out of criminal acts. Both Lexington policies exclude

25  coverage for criminal acts:

26         *This policy does not apply:*

27         *. . .*

28         *Under Coverage C, Public Officials' Errors and Omissions Liability, for:*

ORDER
Page 17

1     . . .

2          *(8) Liability arising out of knowingly violating any statute, law, act, or ordinance,*

3          *whether Federal, State, City, County, or District.*

4          *(9) Liability arising out of the willful commission of a crime.*

5 Dkt. 23-5, Exh. 4 at 3, 7-8; Dkt. 23-6, Exh. 5 at 3, 7-8.

6     The 1998-99 Gulf policy includes a similar exclusion:

7     *This policy does not apply:*

8     . . .

9     *Under Coverage C, Public Officials' Errors and Omissions Liability, for :*

10     . . .

11          *(9) Liability arising out of the willful commission of a crime. We shall not pay any*
         *cost that results from the defense, investigation, and settlement of any Occurrence*

12          *or Wrongful Act arising out of any losses excluded herein.*

13 Dkt. 25, Exh. A at 7, 9-10.

14     Criminal act exclusions are also interpreted to comport with a layperson's understanding.

15 *Allstate Ins. Co. v. Raynor*, 143 Wn.2d 469, 476 n.4 (2001). Because "[n]o reasonable insurance

16 purchaser would consider a criminal act somehow less criminal simply because a suicide or some

17 other circumstance prevented its prosecution in a court of law," a criminal action exclusion may

18 still apply to criminal acts not resulting in convictions. *Id.*

19     The parties dispute whether the coverage Specialty seeks is for liability arising out of

20 criminal acts. The defendants contend that the City's liability arises solely out of the death of

21 Crystal Brame and that Crystal Brame's death constituted willful commission of murder by David

22 Brame. Dkt. 22 at 14. Specialty contends that Crystal Brame's death was not a murder and

23 therefore falls outside of the exclusion for criminal acts and that the City's liability also arises from

24 non-criminal conduct of City officials. Dkt. 31 at 18.

25     While several entities, and the underlying plaintiffs, deem Ms. Brame's death a homicide,

26 there is a genuine issue of material fact as to whether Ms. Brame's death constitutes a willful

27 commission of a crime under the Lexington and Gulf 1998-99 policies. *See* Dkt. 34, Exh. 4

28 (Attorney General's Office); Dkt. 45-2, Exh. A (Pierce County Prosecutor's Office); Dkt. 45-3,

ORDER
Page 18

1   Exh. B (Gig Harbor Police Department); Dkt. 45-3, Exh. D (Tacoma Police Department); Dkt.

2   45-3, Exh. F (underlying plaintiffs' attorney); Dkt. 56, Exh. 5 at 74 (witness account that shots

3   were too close together to evidence a murder suicide). The fact that Chief Brame was never

4   convicted of a crime associated with his wife's death does not foreclose application of the criminal

5   act exclusion. *See Raynor*, 143 Wn.2d at 476 n.4 ("No reasonable insurance purchaser would

6   consider a criminal act somehow less criminal simply because a suicide or some other

7   circumstance prevented its prosecution in a court of law.").

8          In *Raynor*, under facts similar to those in this case, the court determined that a criminal act

9   exclusion applied. *Id.* at 478. There, the insured shot and killed two people and then himself. *Id.*

10   at 474. The court held that a criminal acts exclusion applied to the shooting and precluded

11   coverage:

12          The record is unequivocal that [the insured] was able to perceive the nature and quality of
            his actions-i.e., pointing a loaded firearm directly at [the victims] and repeatedly pulling
13          the trigger at close range- and that he was able to understand the wrongfulness of those
            actions. Thus, whether or not he was suffering diminished mental capacity at the time, [the
14          insured] clearly engaged in serious criminal conduct done with, at the very least, "a
            wrongful disposition to harm or injure other persons." *Van Riper*, 1 Wash.2d at 642, 96
15          P.2d 588. We hold that the average insurance purchaser would reasonably apply the
            policy's criminal act exclusion to Milton's conduct.

16
17   *Id.* at 478. This Court is not yet in a position to reach such a conclusion as to the shooting of

18   Crystal Brame. There are genuine issues of material fact as to the nature of Chief Brame's actions

19   and the role that Chief Brame played in the death of his wife such that the Court should decline to

20   rule as matter of law whether liability for Ms. Brame's death does or does not arise from wilful

21   commission of a crime.

22          Specialty urges the Court to apply the "efficient proximate rule" to the facts of this case

23   and conclude that even if David Brame's committed a criminal act, Ms. Brame's death is

24   nevertheless entitled to coverage. Dkt. 31 at 18.

25          What facilitated the losses here, including the ultimate death of Crystal, was the City's
            failure to pay heed to psychological reports, rape allegations, sexual harassment
26          allegations, ignoring Crystal's calls for help, ignorance of Brame's false reports, and
            related wrongful acts. The City's conduct spanned over two decades, and Lexington's
27          coverage was in the middle of continuing conduct ultimately led to Crystal's death.

28   Dkt. 31 at 19.

1    Washington has adopted the "efficient proximate rule," by which recovery is allowed for a

2  final event excepted from coverage but attributable to a chain of causation started by a risk that is

3  not excepted from coverage. *Raynor*, 143 Wn.2d at 479-80. The rule has been stated as follows:

4  "Where a peril specifically insured against sets other causes in motion which, in an unbroken

5  sequence and connection between the act and final loss, produce the result for which recovery is

6  sought, the insured peril is regarded as the 'proximate cause' of the entire loss." *Id.* at 479. The

7  efficient proximate cause rule applies only if two or more independent forces operate to cause the

8  loss. *Kish v. Insurance Co. of North America*, 125 Wn.2d 164, 171 (1994). If the loss is the result

9  of only a single cause, even one susceptible to various characterizations, the efficient proximate

10  cause analysis does not apply. *Id.* If the efficient proximate cause rule applies, determining which

11  event constitutes the efficient proximate cause is normally a question of fact for the jury but it may

12  be decided as a question of law if "the facts are undisputed and the inferences therefrom are plain

13  and incapable of reasonable doubt or difference of opinion." *See Raynor*, 143 Wn.2d at 480 n.10.

14    The defendants contend that the efficient proximate cause rule does not apply to the

15  criminal acts exclusion at issue in this case. Dkt. 22 at 20. Specifically, the defendants contend

16  that the exclusion of "[l]iability arising out of the willful commission of a crime" is not limited to

17  liability *proximately caused* by commission of a crime and that the City's negligence, if any, was

18  not the efficient proximate cause of Crystal Brame's death. Dkt. 22 at 20; Dkt. 23-5, Exh. 4 at 3,

19  7-8; Dkt. 23-6, Exh. 5 at 3, 7-8; *Toll Bridge Authority v. Aetna Ins. Co.*, 54 Wn. App. 400, 407

20  (1989) (Declining to apply the efficient proximate cause rule to the "arising out of" standard of

21  causation because "'[a]rising out of' and 'proximate cause' describe two different concepts.");

22  *Stouffer & Knight v. Continental Cas. Co.*, 96 Wn. App. 741, 752 (1999) (The court was not

23  "persuaded to extend" the rule to the facts of the case.). The defendants are correct that

24  determination of whether the claimed damage arose out of criminal acts does not require

25  determination of the proximate cause of such damages. Because the "arising out of" and

26  "proximate cause" standards are different, Specialty cannot establish coverage merely by

27  demonstrating the efficient proximate cause of Ms. Brame's death and must instead prove that the

28  death did not arise out of any criminal acts. Whether Specialty will succeed in carrying this burden

ORDER
Page 20

1  is an issue for trial.

2     The defendants also contend that Specialty cannot claim damages unrelated to Crystal

3  Brame's death and that the only damages alleged stem from Crystal Brame's death. Dkt. 22 at 14,

4  19. Specialty contends that it would have a claim even if David Brame had not shot Crystal

5  Brame. Dkt. 31 at 19. Specialty alleges the following negligence by City officials: "failure to pay

6  attention to, or suppression of, the mounting evidence Brame was not suitable to be a police

7  officer" and "failure to pay heed to psychological reports, rape allegations, sexual harassment

8  allegations, ignoring Crystal's calls for help, ignorance of Brame's false reports, and related

9  wrongful acts." Dkt. 31 at 19; *see also* Dkt. 34-5, Exh. 4 at 12 (Correspondence from the

10 Attorney General's Office noting that "[a]s far back as 1996, Chief Brame had a fellow Tacoma

11 police officer document his 'injuries.' He also made a report to local police to 'document' the

12 abuse he allegedly suffered at the hands of his wife."); Dkt. 34-5, Exh. 4 at 12-13 (Crystal Brame

13 made a domestic violence complaint in 1996. She also recounted the history of domestic violence

14 in her marriage when she made a domestic violence complaint in 2003.).  Specialty challenges the

15 credibility, accuracy, and persuasiveness of the Washington Association of Sheriffs and Police

16 Chiefs report, which reviewed the City's personnel practices with respect to David Brame. Dkt.

17 55 at 10; Dt. 47, Exh. B. at 5. Issues of credibility and persuasiveness are for the trier of fact.

18 Whether Specialty will be able to prove damages, other than for Ms. Brame's death, occurring

19 during the defendants' policies is also a question for the trier of fact.

20        **c. Conclusion**

21     The Court has determined that there are genuine issues of material fact precluding

22 summary judgment. The issues include whether losses from wrongful acts occurred during the

23 two later Lexington policies and during the Gulf policies, whether Ms. Brame's death constitutes

24 willful commission of a crime, and whether the claimed damages arose out of willful commission

25 of a crime. With the exception of Lexington Policy 1 and Policy 2, as explained above, the Court

26 should therefore decline to grant summary judgment as to Coverage C.

27 **F. EMPLOYMENT PRACTICES LIABILITY**

28     Specialty contends that coverage is provided under Endorsement No. 5 to Lexington

1   Policies 2, 3, and 4 and under Endorsement 2 to the Gulf policies. Lexington defines "personal

2   injury" to include "[w]rongful termination or discrimination rising out of employment practices as

3   more fully set forth in endorsement no. 5." Dkt. 23-4, Exh. 3 at 9; Dkt. 23-5, Exh. 4 at 10;[1] Dkt.

4   23-6, Exh. 5 at 10. Endorsement 5 provides as follows:

5           *It is agreed that this Policy shall apply to a Wrongful Act that the Insured becomes
            legally obligated to pay to compensate other[s] for an occurrence resulting from the
6           Insureds Employment Practices Claims. An Employment Practice Claim must take place
            solely in or arise out of the conduct of the Insureds business operations.*

7
            *It is further agreed that the following Definitions are hereby added to the policy:
8           1. Wrongful Act solely in respect of Employment Practices Liability means any actual or
            alleged negligent act, error or omission.*

9
            *2. Employment Practice Claim means any wrongful act relating to a past, present, or
10          prospective employee of the Insured for or arising out of any actual or alleged wrongful
            dismissal, discharge or termination, either actual or constructive, of employment,
11          employment related misrepresentation, wrongful failure to employ or promote, wrongful
            deprivation of career opportunity, wrongful discipline, failure to grant tenure or
12          negligent employee evaluation; or sexual or workplace harassment of any kind,
            including, but not limited to, the alleged operation of a harassing workplace
13          environment, or unlawful discrimination, whether direct, indirect, intentional or
            unintentional, or failure to provide adequate employee policies and procedures.*

14
15   Dkt. 23-4, Exh. 3 at 22; Dkt. 23-5, Exh. 4 at 20; Dkt. 23-6, Exh. 5 at 20-21. The Gulf policies

16   include similar language, and Endorsement 2 to the Gulf policies also serves to define wrongful

17   termination or discrimination. *See* Dkt. 25, Exh. A at 12 (definition of "personal injury"), 19

18   (Endorsement 2); Dkt. 25, Exh. B at 47 (definition of personal injury), 31 (Endorsement 2).

19       Specialty contends that this language grants a fourth type of coverage for employment

20   practices. Dkt. 31 at 20. Specialty's reading would expand the Lexington and Gulf policies to

21   include a fourth type of coverage distinct from coverage for personal injury, property damage,

22   and public officials errors and omissions. The language of the policies do not support such a

23   reading, however. First, the endorsements are referenced by the policies as describing employment

24   practices that give rise to wrongful termination or discrimination  Dkt. 23-4, Exh. 3 at 9; Dkt. 23-

25   5, Exh. 4 at 10; Dkt. 23-6, Exh. 5 at 10; *See* Dkt. 25, Exh. A at 12; Dkt. 25, Exh. B at 47. The

26   endorsements themselves also limit their provisions to the definitions of "personal injury" set forth

27
28       [1]The reference to Endorsement 2 in the definition contained in this particular policy appears to be a
     typographical error. Endorsement 2 is entitled, "Rate Guarantee and Credit Schedule."

ORDER
Page 22

1  in the policies. The endorsements begin with the following language: "In respect of definition

2  K(8) [M(8)]." Dkt. 23-4, Exh. 3 at 22; Dkt. 23-5, Exh. 4 at 20; Dkt. 23-6, Exh. 5 at 20; Dkt. 25,

3  Exh. A at 19; Dkt. 25, Exh. B at 31. Second, the endorsements are limited to claims of

4  "*[w]rongful termination or discrimination* arising out of employment practices due to" the

5  following:

6        *A. The refusal to employ any person who is an applicant for employment;*

7        *B. The termination of any person's employment;*

8        *C. Employment-related practices, policies, acts or omissions such as coercion, demotion,*
9        *evaluation, reassignment, discipline, defamation, harassment, humiliation or*
         *discrimination directed at that person; or*

10       *D. The spouse, child, parent, brother or sister of that person or persons as a*
11       *consequences [sic] of any of the employment-related practices described in paragraph*
         *A., B., or C. above is directed.*

12  Dkt. 23-4, Exh. 3 at 22 (emphasis added); Dkt. 23-5, Exh. 4 at 20; Dkt. 23-6, Exh. 5 at 20; *see*

13  *also* Dkt. 25, Exh. A at 19; Dkt. 25, Exh. B at 31. Finally, this language does not avoid the

14  requirement that the "personal injury," a term that the endorsement professes to define further,

15  occur during the policy period. *See* Dkt. 23-3, Exh. 2 (Lexington) at 3; Dkt. 23-4, Exh. 3

16  (Lexington) at 3; Dkt. 23-5, Exh. 4 (Lexington) at 3; Dkt. 23-6, Exh. 5 (Lexington) at 3; Dkt.

17  25, Exh. A (Gulf) at 6; Dkt. 25, Exh. B (Gulf) at 39.

18       The underlying plaintiffs did not allege wrongful termination or discrimination. The Court

19  should therefore deny Specialty's cross motions as to entitlement to coverage under Endorsement

20  5 of Lexington Policies 2 (Policy Number 866-9098), 3 (Policy Number 878-6557), or 4 (Policy

21  Number 8898421) or under Endorsement 2 to the Gulf policies.

22  **G. MOTIONS TO FILE EXHIBITS UNDER SEAL**

23       Also pending before the Court are two Motions to File Exhibits Under Seal (Dkt. 37; Dkt.

24  57). Sealing of court records is governed by Local Rule CR 5(g):

25       (g) Sealing of Court Records.

26       (1) This rule sets forth a uniform procedure for sealing court files, cases, records,
        exhibits, specified documents, or materials in a court file or record. There is **a strong**
27       **presumption** of public access to the court's files and records which may be overcome only
        on a **compelling** showing that the public's right of access is outweighed by the interests of
28       the public and the parties in protecting files, records, or documents from public review.

Nothing in this rule shall be construed to expand or restrict statutory provisions for the sealing of files, records, or documents.

(2) The court may order the sealing of any files and records on motion of any party, on stipulation and order, or on the court's own motion. If no defendant has appeared in the case, the motion to seal may be presented ex parte. **The law requires, and the motion and the proposed order shall include, a clear statement of the facts justifying a seal and overcoming the strong presumption in favor of public access**. . . .

Local Rule CR 5(g) (emphasis added).

Specialty first moves to seal the Washington State Patrol Internal Affairs Administrative Report ("the Report"), contending only that the Report was sealed in Washington State Superior Court and that Specialty is unaware of which sections of the Report were redacted when the Report was released to the public. Dkt. 37 at 1-2. As support, Specialty offers a copy of a protective order issued by King County Superior Court. Dkt. 37, Att. A at 4. The order sealing the Report, if such an order was entered, does not accompany the motion. Specialty offers no facts indicating that the Report should be sealed or that the strong presumption in favor of the public's right of access to the courts is outweighed. The Court should therefore deny the Motion to File Exhibits Under Seal (Dkt. 37) without prejudice to a further showing that the Washington State Patrol Internal Affairs Administrative Report (filed as Exhibit 11 at Dkts. 38, 39, 40, 41) should be sealed.

Specialty also moves to seal the transcript of the Deposition of David T. Olsen because it includes  the name of a victim of an alleged rape. Dkt. 37 at 2. Specialty contends that it did not have time to redact the information before filing the transcript. *Id.* The Court should therefore deny the motion. The transcript (filed as Exhibit 18 at Dkt. 42) may remain sealed until Specialty files a redacted version.

Finally, Specialty moves to seal a four-page document labeled "CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT." Dkt. 57 at 1-2. This document was prepared in anticipation of, and for use in, the underlying lawsuit by attorneys representing some of the defendants. Dkt. 59 at 1. The public interest in accessing the courts does not outweigh the compelling need to honor the attorney-client privilege. Plaintiff Specialty's Motion to File Exhibit Under Seal (Dkt. 57) should be granted.

# V. ORDER

Therefore, it is hereby

**ORDERED** that Defendant Lexington Insurance Company's Motion for Summary Judgment (Dkt. 22), joined by Gulf Underwriters Insurance, Inc. (Dkt. 24) is **GRANTED in part** and **DENIED in part** as follows: The motion is **GRANTED** as to coverage for Ms. Brame's death under Coverage A of the Lexington and Gulf policies, **GRANTED** as to Coverage B of the Lexington and Gulf policies, **GRANTED** as to Coverage C under Lexington Policy Number 8669038 and Lexington Policy Number 866-9098, and otherwise **DENIED**. It is further **ORDERED** that

Specialty's Cross Motion for Partial Summary Judgment Against Lexington (Dkt. 35) and Specialty's Motion for Partial Summary Judgment Against Gulf (Dkt. 53) are **DENIED**, and that Plaintiff Specialty's Motion to File Exhibit Under Seal (Dkt. 57) is **GRANTED**. It is further **ORDERED** that

Plaintiff Specialty's Unopposed Motion to File Exhibits Under Seal (Dkt. 37) is **DENIED** as follows:

(1) The Clerk is directed to **UNSEAL** Exhibit 11 (Dkts. 38, 39, 40, 41),

(2) Specialty is **ORDERED** to file a redacted version of the transcript (filed as Exhibit 18 at Dkt. 42) on or before September 14, 2007, and

(3) upon the filing of a redacted version of the transcript, the Clerk is directed to **UNSEAL** Exhibit 18 (Dkt. 42).

1    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

2  of record and to any party appearing *pro se* at said party's last known address.

3    DATED this 17th day of August, 2007.

4

5

6    ROBERT J. BRYAN

7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page 26